## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| STEVEN P. ISAAC, | : | Case No. 3:13-cv-125 |
| | : | |
| Plaintiff, | : | District Judge Thomas M. Rose |
| | : | Chief Magistrate Judge Sharon L. |
| vs. | : | Ovington |
| | : | |
| CAROLYN COLVIN, | : | |
| Acting Commissioner of the Social | : | |
| Security Administration, | : | |
| | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATIONS[1]

This Social Security disability benefits appeal is before the Court on Plaintiff
Stephen P. Isaac's statement of errors (Doc. # 5), the parties' responsive memoranda
(Docs. # 8, 9), the administrative record (Doc. # 4), and the record as a whole.  At issue is
whether the Administrative Law Judge ("ALJ") Carol K. Bowen erred in finding Plaintiff
"not disabled" and therefore not entitled to disability insurance benefits ("DIB") and
supplemental security income ("SSI").  (*See* Doc. #4, PageID at 34-44).

### I.  INTRODUCTION

Plaintiff filed an application for DIB on January 7, 2009 and an application for SSI
on January 16, 2009.  (*Id*., Page ID at 37).  He alleged that he became unable to work
beginning March 24, 2008 due to the following impairments: (1) crippled hands; (2) back

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and
Recommendations.

condition; (3) poor breathing; (4) hot/cold sensations in his legs; and (5) a chest hernia. (*Id.* at 156).  His claims were denied initially and on reconsideration.  Plaintiff subsequently requested a hearing before an ALJ.

ALJ Bowen held a hearing on Plaintiff's claims on December 13, 2010.  (*Id*. at 37).  Plaintiff and a vocational expert testified, with Plaintiff's non-attorney representative in attendance.   On January 26, 2011, the ALJ rendered an unfavorable decision, finding that Plaintiff, despite severe physical impairments, had the residual functional capacity ("RFC")[2] to perform a restricted range of light and sedentary unskilled work.  (*Id.* at 40-44).  Based on Plaintiff's age, education, work experience, and RFC, the ALJ found that there were a significant number of jobs in the national and regional economy that Plaintiff could perform.  (*Id.* at 43-44).  Therefore, the ALJ found that Plaintiff was not disabled.  (*Id.* at 44).  This decision became final and appealable on April 10, 2012 when the Appeals Council denied Plaintiff's request for review.  (*Id.* at 26-28).  Plaintiff seeks judicial review pursuant to section 205(g) of the Act.  42 U.S.C. §§ 405(g), 1383(c)(3).

At the time of the ALJ's hearing, Plaintiff was 45 years old.  He has a 12th grade education.  He does not have special job training and did not complete trade or vocational school.  (*Id*. at 161).  The ALJ found that Plaintiff was unable to perform his past relevant work as a plasterer due to his impairments.  (*Id.* at 42).

---

[2] A claimant's RFC is an assessment of "the most [he] can still do despite [his] limitations."  20 C.F.R. § 416.945(a)(1).

The ALJ conducted the five-step sequential evaluation mandated by Social

Security Regulations, finding as follows:

1.  The claimant meets the insured status requirements of the Social Security Act through June 30, 2010.

2.  The claimant has not engaged in substantial gainful activity since March 24, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: coronary artery disease with stenting; mild lumbar degenerative disc disease; obesity; and carpal tunnel syndrome bilaterally (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that he is restricted to occasional climbing of ramps, and stairs, and he cannot climb ladders, ropes or scaffolds.  He is restricted to frequent handling, fingering, and feeling bilaterally.  He cannot use vibrating hand tools or power tools, and he can do no forceful gripping or torque use with the left hand.  He is restricted to a clean-air, temperature-controlled environment.  He cannot work around hazardous machinery, at unprotected heights, or engage in driving as part of the job duties.  He cannot engage in fast-paced production or be held to strict production demands.

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.  The claimant was born on April 28, 1965 and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has at least a high school education and is able to communicate in English  (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding

that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from March 24, 2008, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Doc. #4, PageID at 39-44).

The ALJ ultimately concluded that Plaintiff was not under a "disability" as defined by the Social Security Regulations and was therefore not entitled to DIB or SSI. (*Id.* at 44).

Plaintiff presently argues that: (1) the ALJ erred in her assessment of the limitations imposed by Plaintiff's carpal tunnel syndrome and hand impairments; (2) the ALJ failed to give appropriate weight to the medical opinions of Plaintiff's examining and treating physicians; (3) the ALJ erred in assessing the credibility of Plaintiff's claims; (4) the ALJ erred in her assessment of the limitation imposed by Plaintiff's heart impairment; and (5) the ALJ's finding regarding Plaintiff's vocational opportunities was based upon improper and outdated information.

## II.  STANDARD OF REVIEW

The Court's inquiry on appeal is limited to whether the ALJ's non-disability finding is supported by substantial evidence and whether the correct legal standard was applied.  42 U.S.C. § 405(g); *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010).  Substantial evidence is more than a "mere scintilla" but less than a preponderance

4

of the evidence. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  It is

"such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing an ALJ's decision, the district court looks to the record as a whole

and may not base its decision on one piece of evidence while disregarding all other

relevant evidence. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).  Even if the

district court "might have reached a contrary conclusion of fact, the [ALJ's] decision

must be affirmed so long as it is supported by substantial evidence." *Kyle*, 609 F.3d at

854-855 (citing *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 604-05 (6th Cir. 2009)).

The claimant bears the ultimate burden to prove that he is entitled to disability

benefits.  20 C.F.R. § 404.1512(a).  That is, he must present sufficient evidence to show

that, during the relevant time period, he suffered an impairment, or combination of

impairments, expected to last at least twelve months, that left him unable to engage in

"substantial gainful activity."  42 U.S.C. § 423(d)(1)(A).

## III.  BACKGROUND

### A.  Plaintiff's Physical Impairments

#### Connie Ball, M.D.

Plaintiff began treatment with his primary care physician, Dr. Connie Ball, in

September 2004.  (Doc. #4, Page ID at 226).  In March 2009, Dr. Ball noted that Plaintiff

had been experiencing hand parasthesia and weakness for two years.  (*Id.* at 334).

However, these impairments were not mentioned in Dr. Ball's prior notes.  (*Id.* at 218-27,

252-57, 332-33).  Dr. Ball also noted for the first time that Plaintiff is unable to sit or

5

stand for long periods of time, that he cannot lift or hold heavy objects, and has trouble climbing stairs and ladders.  (*Id.* at 334).

In March 2010, Dr. Ball completed a Physical Capacities Evaluation in which she opined that Plaintiff can only sit, stand, and walk for less than one hour in an eight-hour work day and that he would need to alternate sitting and standing at will periodically throughout the day.  (Doc. #4, PageID at 403).  Further, Dr. Ball stated that Plaintiff is unable to adequately perform simple grasping, fine manipulation, or repetitive motion tasks (*e.g.*, writing or typing) with either hand, although he is able to push and pull with both hands.[3]  (*Id.*)  Dr. Ball also notes that Plaintiff is unable to use either of his feet for repetitive movements such as operating foot controls.  (*Id.*)  Additionally, Plaintiff can only occasionally[4] lift and carry up to four pounds, can occasionally bend and reach above shoulder level, but can never squat, crawl or climb.  (*Id.* at 403-04).  Dr. Ball further opined that Plaintiff is severely restricted from activities involving unprotected heights, being around moving machinery, and driving automotive equipment.  (*Id.* at 404).  Additionally, Plaintiff is moderately restricted from exposure to marked changes in temperature and humidity, as well as exposure to dust, fumes, and gases.  (*Id.*)  Finally, Dr. Ball opined that Plaintiff's pain significantly handicaps his ability to maintain attention and concentration, and eliminates his ability to perform skilled work tasks.  (*Id.*)

---

[3] The Court notes the inconsistency of opining that Plaintiff cannot perform simple grasping with either hand yet can adequately push and pull with both.

[4] The Physical Capacities Evaluation form states that the term "occasionally" refers to up to 33% of an eight-hour workday.  (Doc. 4, Page ID at 403).

**Ajay Reddivari, M.D.**

In March 2008, Plaintiff underwent cardiac catheterization[5] performed by cardiologist, Dr. Ajay Reddivari. (Doc. #4, PageID at 287). Plaintiff had two stents inserted during the procedure. By June 2008, Dr. Reddivari noted that Plaintiff "appear[ed] to be doing quite well." (*Id.* at 285). In September and October 2008, Plaintiff complained of atypical chest discomfort. (*Id.* at 282, 284). Although Dr. Reddivari initially noted that the cause "does not appear to be cardiac," he ultimately chose to increase Plaintiff's medical therapy. (*Id.* at 280, 284). In November 2008, Dr. Reddivari noted that Plaintiff was again "doing quite well," though he complained of fatigue and difficulty sleeping. (*Id.* at 279). Dr. Reddivari believed the cause of Plaintiff's complaints might be depression. (*Id.*) By December 2008, Dr. Reddivari noted that Plaintiff's depression had improved, possibly due to changes in his medication. (*Id.* at 278).

In March 2009, Dr. Reddivari wrote that "[Plaintiff] denie[d] chest discomfort or shortness of breath," and appear[ed] to be doing well. (*Id*. at 315). However, in September 2009, Plaintiff underwent an exercise stress test, which was terminated after six minutes and fifteen seconds due to fatigue. (*Id.* at 365). Plaintiff also underwent another cardiac catheterization that same month, during which two stents were placed. (*Id.* at 367). Dr. Reddivari observed that Plaintiff was doing well following the

---

[5] Cardiac catheterization is a medical procedure performed by threading a thin, flexible tube ( a catheter) to the heart for purposes of diagnostic testing and treatment. National Heart, Lung, and Blood Institute, *What is Cardiac Catheterization?*, U.S. Dep't of Health & Human Servs. (Jan. 30, 2012), http://www.nhlbi.nih.gov/health/health-topics/topics/cath/.

procedure, although his blood test revealed elevated glucose levels. (*Id.*) Dr. Reddivari advised Plaintiff to see his primary care physician immediately to manage his diabetes. (*Id.* at 408).

During a follow-up appointment on November 2, 2009, Dr. Reddivari noted that, despite occasional chest discomfort, Plaintiff was feeling well and his shortness of breath had significantly improved. (*Id.*) However, Dr. Reddivari completed a medical questionnaire that same day, but after the appointment, and opined that Plaintiff did not have the stamina to complete a full workday. Dr. Reddivari declined to provide details in support of this opinion. (*Id.* at 442). Specifically, Dr. Reddivari stated that Plaintiff suffered daily symptoms including shortness of breath, chest pain, and dizziness, which were precipitated by walking and lifting. However, when asked to approximate how much Plaintiff could lift, Dr. Reddivari wrote "don't know."[6] (*Id.* at 443). Dr. Reddivari did not estimate how long Plaintiff could sit, stand, or walk. (*Id.*) Additionally, Dr. Reddivari opined that Plaintiff should avoid stressful situations, yet he did not know what specific types of work-related situations Plaintiff should avoid.[7] (*Id.* at 442-43).

_____

[6] Dr. Reddivari also did not state whether Plaintiff could push, pull, or engage in fine manipulation with either hand. (Doc. #4, Page ID at 443). Further, he could not indicate whether Plaintiff was able to bend, squat, crawl, climb, or reach above shoulder level. (*Id.*) He did, however, state that Plaintiff could perform simple grasping with both hands. (*Id.*)

[7] The medical questionnaire provides the following list of stressful work-related situations and asks the physician to select which, in particular, his patient should avoid: "[d]ealing with the public/Public presentations/customer service, [w]orking with time deadlines or quotas, [t]raveling, [m]anagerial responsibilities (i.e., hiring, firing, etc.), [c]omplex or precision tasks/decision-making, [a]djusting to changes in the work environment." (Doc. #4, Page ID at 443). Dr. Reddivari responded by writing "[d]on't know." (*Id.*)

After the hearing and at the ALJ's request, Plaintiff obtained an RFC questionnaire from Dr. Reddivari.  (Doc.#4, PageID at 444).  The RFC questionnaire asks whether Plaintiff is able to perform work requiring: (1) standing and/or walking up to 6 hours of an 8-hour day; (2) lifting and/or carrying up to 20 pounds occasionally; (3) lifting and/or carrying up to 10 pounds frequently; (4) standing and/or walking up to 2 hours of an 8-hour day; (5) sitting 6 or more hours of an 8-hour day; (6) lifting and/or carrying up to 10 pounds occasionally; (7) lifting and/or carrying up to a few pounds frequently.[8]  (*Id*. at 445).  Dr. Reddivari responded "no" to all, indicating that Plaintiff is unable to perform any of the tasks.  (*Id.*)  However, Dr. Reddivari did not respond to the follow-up question asking him to "describe the objective findings that support [his] opinion."  (*Id.*)

**Damian M. Danopulos, M.D.**

Dr. Damian M. Danopulos examined Plaintiff on March 2, 2009, on behalf of the Ohio Bureau of Disability Determination.  (Doc. #4, PageID at 289-99).  Plaintiff reported to Dr. Danopulos that he had suffered from bilateral hand pain for the past four to five years, hindering his ability to grip or make a fist.  (*Id.* at 290).  Plaintiff reported that his primary care physician recommended taking aspirin for his hand pain.  (*Id.*)  However, his primary care physician had prescribed narcotics in the past for lower back pain.  (*Id.* at 291).  Plaintiff also stated that he has high blood pressure and high cholesterol.  (*Id.*)

---

[8] The RFC questionnaire combines these inquiries into two questions (*i.e.*, (1)-(3) are combined under Question 1 and (4)-(7) are combined under Question 2).  (Doc.#4, PageID # 445).

Dr. Danopulos observed that Plaintiff appeared for the examination without ambulatory aids, moved in the examination room freely and with a normal gait, had full range of motion in his upper and lower extremities, was able to dress and undress normally, was able to get on and off the examination table without difficulty, that his bilateral straight leg raise was normal, that his squatting and arising from squatting was normal, and that his remaining movements were normal. (Doc. #4, PageID at 292-93). Further, Dr. Danopulos noted normal heart tones and no labored breathing. (*Id.*)

Dr. Danopulos stated that both of Plaintiff's hands showed thick skin, were painful by palpation, and that the left hand could not make a proper fist. (*Id*. at 294). However, he noted that Plaintiff's left hand x-rays appeared normal and that there were no other apparent abnormalities. Before his appointment with Dr. Danopulos, Plaintiff underwent manual muscle testing that revealed good to normal motor function of the shoulders, elbows, wrists, fingers, hips, knees, feet, and toes, on both the right and left side. (*Id.* at 295). Further, Plaintiff's left and right hand gripping, manipulation, pinch, and fine coordination were normal. (*Id.*) Plaintiff's grip strength was lower in his left hand, but he did not present any deformities, joint swelling, muscle spasm, or muscle atrophy. (*Id.* at 296).

Ultimately, Dr. Danopulos's objective findings included: (1) left hand joint pain with diminished grip strength; (2) normal grip strength with minimal if any arthritic changes in the right hand; (3) lumbar spine early arthritic changes; (4) non-treated mild hypertension; (5) history of coronary heart disease without current angina pectoris; and (6) mild degree emphysema without restrictive component. ( *Id*. at 294). Dr. Danopulos

10

opined that these findings affect Plaintiff's abilities to perform work-related activities.
(*Id.*)

### Rannie AlSamkari, M.D.

On October 26, 2010, Plaintiff saw hand surgeon, Dr. Rannie AlSamkari,
regarding bilateral hand pain, numbness, and tingling. (Doc.. #4, PageID at 436). Dr.
AlSamkari noted that Plaintiff's left ring finger and right long finger were actively
triggering and locking. (*Id.*) Dr. AlSamkari wrote that Plaintiff appeared to be suffering
from "tenosynovitis of the right index finger, right long finger, left index finger, left long
finger, left ring finger with trigger digits of the left ring finger and right long finger." (*Id.*
at 437). Additionally, Plaintiff appeared to suffer from bilateral carpal tunnel syndrome.
Dr. AlSamkari also stated that Plaintiff had no swelling, masses, or deformities and that
his range of motion was intact in his shoulders, elbows, wrists, and digits. Plaintiff was
sent for an EMG to evaluate his carpal tunnel syndrome. The EMG revealed bilateral
median nerve compression neuropathy at the wrist consistent with carpal tunnel
syndrome. (*Id.* at 438). Further, the EMG-results analysis states, "[t]he electrodiagnostic
abnormalities are mild but clinically appear more severe." (*Id.*)

On November 8, 2010, Plaintiff underwent surgery performed by Dr. AlSamkari
for "left carpal tunnel release with injection of the left ring finger and right long finger
trigger digits." (*Id.* at 434, 440). Dr. AlSamkari noted that there was moderate
compression of the median nerve at the carpal tunnel. (*Id.* at 440). During his post-
operative appointment on November 23, 2010, Plaintiff stated that he noticed
improvement in sensation, although there was continued triggering. (*Id.* at 433). In

addition, Plaintiff stated that his left long finger had started triggering.  Dr. AlSamkari noted that Plaintiff was doing well, had good wrist range of motion, and no hypersensitivity.  Dr. AlSamkari further stated that he would discuss similar surgery on the right hand if Plaintiff still had triggering at his next appointment.  (*Id.*)

### B.  Psychological Impairments

The ALJ's decision notes that although depression is mentioned in the medical records, Plaintiff has not undergone formal treatment for the condition.  (Doc. #4, PageID at 40). In evaluating Plaintiff's depression, the ALJ considered the four broad functional areas for evaluation of mental disorders set forth in the disability regulations and in section 12.00C of the Listing of Impairments.  (*Id.*)  Based upon Plaintiff's testimony and the records from Dr. Ball and Dr. Reddivari, the ALJ determined that Plaintiff's "medically determinable mental impairment causes no more than 'mild' limitation in any of the first three functional areas and 'no' episodes of decompensation which have been of extended duration in the fourth area."  (*Id.*)  Accordingly, the ALJ found that Plaintiff's depression caused only minimal limitation in his ability to perform basic mental work activities and is therefore not severe.

### C.  Opinion of Reviewing Physicians

Medical consultant, Dr. Leigh Thomas, provided a Physical Residual Functional Capacity Assessment regarding Plaintiff on March 31, 2009.[9]  (Doc. #4, PageID at 300-

---

[9] The RFC Assessment form specifies that the term "occasionally" means "occurring from very little up to one-third of an 8-hour workday (cumulative, not continuous)."  (Doc. #4, Page ID at 301).  The term "frequently" means "occurring one-third to two-thirds of an 8-hour workday (cumulative, not continuous)."  (*Id.*)

07).  Dr. Thomas found that Plaintiff could lift and/or carry (including upward pulling) up to 20 pounds occasionally and 10 pounds frequently, could stand and/or walk with normal breaks for a total of 6 hours in an 8-hour workday, and could sit with normal breaks for a total of 6 hours in an 8-hour workday.  (*Id.* at 301).  Dr. Thomas stated further that Plaintiff's ability to push and/or pull, including operation of hand and foot controls, was unlimited.  Dr. Thomas opined that Plaintiff was limited to frequent handling and fingering with his left hand.  (*Id.* at 303)  Dr. Thomas noted that although Plaintiff was unable to make a full closed fist, his x-rays did not show abnormalities.  Dr. Thomas stated that Plaintiff had no other manipulative, postural, visual, communicative, or environmental limitations.  (*Id.* at 302-04).

Further, Dr. Thomas wrote that Plaintiff "alleges he is [unable] to lift or hold anything and if he does lift something it causes back pain," and that "he is unable to walk [without] pain."  (*Id.*, PageID at 305).  However, Dr. Thomas noted that Plaintiff was "able to move [his] spine virtually [without] pain" and was "able to ambulate normally." (*Id.*)  Dr. Thomas concluded that Plaintiff's allegations were not fully credible and that the "severity of [symptoms] reported [were] disproportionate with [the] expected severity of objective findings."  (*Id.*)

On August 28, 2009, Dr. William Bolz reviewed the record evidence and affirmed Dr. Thomas's assessment.  (*Id.* at 335).

### D.  Hearing Testimony

#### 1. *Plaintiff's Testimony*

At the hearing, Plaintiff testified that he resides with his wife and does not have any dependent children.  (Doc. #4, Page ID at 56-57).  Plaintiff stated that he does drive, though it causes his hands to burn and go numb while holding the steering wheel.  (*Id.* at 57).  Plaintiff testified that he cannot work because he "get[s] fatigued a lot" and has issues "walking, sitting, breathing … [b]asically, doing anything."  (*Id.* at 58).  He stated that he takes medication for angina, high blood pressure, diabetes, as well as a muscle relaxant and Vicodin for pain.  (*Id.* at 59).  He stated that the medications make him dizzy, tired, and cause him to "black out."  (*Id.*)

Plaintiff further testified that he continues to have daily chest pains, which are relieved by sitting and resting.  (*Id.* at 60).  When asked what activities precipitate the chest pains, he identified walking and sitting.  He also stated that he likes "car racing" and "tr[ies] to watch a lot of it on television," because he is no longer able to go to the tracks.  (*Id.* at 61-62).  However, he does run errands and drives to his mother's house. He is occasionally able to do light housework, such as washing dishes, folding clothes, picking up trash, or preparing light meals, but he requires frequent breaks.  (*Id.*)  Plaintiff has trouble with daily activities, such as getting out of the bath, tying his shoes, and buttoning his shirts.  He also has difficulty sleeping and generally sleeps up to five hours a night, although he takes approximately three or four, twenty to thirty minute naps every day.  (*Id.* at 62-63).  Plaintiff asserted that he doesn't socialize or go out frequently, nor does he drink or smoke.  (*Id.* at 63-64).

Plaintiff testified that he cannot climb stairs and is only able to walk approximately one-quarter of a block before he becomes dizzy.  (*Id.* at 64).  Further,

Plaintiff stated that even if he were standing completely still, he would have to sit down within five minutes due to pressure on his back. (*Id.*) Plaintiff takes medication for his back, though he had not had an MRI or addressed alternative treatment options with his physician at the time of his hearing. (*Id.* at 67).

Additionally, Plaintiff claimed that he has trouble lifting even light objects, stating that he requires both hands to pick up a gallon of milk and at times cannot lift his coffee cup. (Page ID # 64-65). Plaintiff testified that he still experiences triggering in his fingers on both hand, despite having had surgery to correct the issue on the left. (*Id.* at 66). However, he is still considering undergoing the same surgery on his right hand. (*Id.* at 65). Plaintiff also experiences frequent chest pain, which requires him to stop and rest. (*Id.* at 69-70). He further testified that he is diabetic, which causes dizziness and tingling on the bottom of his left foot. (*Id.* at 68). Finally, Plaintiff testified that even if a job did not require walking, climbing stairs, or lifting, he could not perform the work because he requires more rest than regular lunch and coffee breaks provide. (*Id.* at 70).

### 2. *Testimony of Vocational Expert*

Vocational Expert ("VE"), William Braunig, classified Plaintiff's past employment as a plasterer at a medium skilled level. (Page ID # 71). Based on Plaintiff's age, education, work experience, and RFC, the VE testified that Plaintiff could not perform his past work. (*Id.* at 72). However, Plaintiff could perform 29,000 light exertion, unskilled jobs in the national economy, such as mail clerk or office helper, as well as 6,800 sedentary jobs, such as a charge account clerk, microfilm document preparer, and weight tester. (*Id.* at 72-73). In response to inquiries from Plaintiff's

counsel, the VE testified that if Plaintiff required additional unscheduled, unpredictable breaks of twenty minutes each, approximately three times per day, he would not be able to maintain employment.  (*Id.* at 76).

The VE confirmed that his testimony was consistent with the *Dictionary of Occupational Titles*.  (*Id* at 77).

## IV.  ANALYSIS

### A.  Plaintiff's Carpal Tunnel Syndrome and Hand Impairments

Plaintiff first contends that the ALJ erred by failing to fully account for the limitations imposed by his hand impairments.  Specifically, Plaintiff argues that the ALJ "limited [him] to frequent use of his hands and no forceful gripping … [but Plaintiff] has more limitation on working 40 hours a week than these."  (Doc. #4, PageID at 448).  Plaintiff further asserts that the ALJ erroneously discounted the medical opinions of his examining and treating physicians, which show that Plaintiff has severe limitations in grasping and manipulating with both hands.[10]

Plaintiff's contention that the ALJ "limited [him] to frequent use of his hands and no forceful gripping," is inaccurate.  (Doc. #5, PageID at 448).  The ALJ placed additional restrictions on Plaintiff's ability to work with his hands, finding that he "is restricted to frequent[11] handling, fingering, and feeling bilaterally … cannot use vibrating

---

[10] The merits of Plaintiff's argument regarding the weight given to each physician's medical opinion are addressed in Section IV(B) of this Report.

[11] A previously noted, *supra*, n.9, in the context of this form, the term "frequently" means one-third to two-thirds of an eight-hour workday (Doc.#4, Page ID at 301) -- *i.e.*, approximately 2.6 hours to 5.3 hours per day.

hand tools or power tools … can do no forceful gripping or torque use with the left hand

… [cannot] engage in driving as part of the job duties … cannot engage in fast-paced

production or be held to strict production demands."[12]  (Doc. #4, PageID at 40).   Further,

the ALJ specifically cites to the opinions of examining physician, Dr. Danopulos, and

Plaintiff's hand surgeon, Dr. AlSamkari, and finds that although Plaintiff's left hand is

more severely impaired, both hands are affected by carpal tunnel.  (*Id.* at 42).  The ALJ

then states that those "limitations … are accommodated by [the] restrictions in

manipulation, gripping, and use of certain tools," as set forth above.  (*Id.*)

The ALJ considered the full extent of Plaintiff's manual limitations, restricted and

excluded certain activities based on the opinions of Plaintiff's examining physicians, and

found that Plaintiff could otherwise make frequent use of his hands.  (*Id*. at 42-44).

Accordingly, substantial evidence supports the ALJ's assessment of Plaintiff's manual

limitations.

### B.  Weight Given to Medical Opinions

Plaintiff argues that the ALJ erred in giving "great weight" to the opinion of Dr.

Thomas, while giving little to no weight to Plaintiff's examining and treating physicians,

Drs. Danopulos, Ball, and Reddivari.  (Doc. #5 at 450-52).  Plaintiff further asserts that

the ALJ erred as a matter of law by failing to give good reasons why she was discounting

the opinions of Drs. Ball and Reddivari.  (*Id.* at 451).  Additionally, Plaintiff alleges that

---

[12] Although some of these restrictions may also be related to other impairments (*e.g.*, Plaintiff's
coronary artery disease), this does not diminish their relevance to Plaintiff's hand impairments.

the ALJ did not state how much weight, if any, was given to Dr. Danopulos's statements regarding Plaintiff's inability to use his left hand.  (*Id.* at 450).

The Regulations state that a treating doctor's opinion must be given "controlling weight" if "well-supported" by objective evidence.  20 C.F.R. § 1527(d)(2).  More weight is generally given to treating sources because they can provide a detailed, longitudinal picture of one's medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from objective findings alone or from reports of individual examinations such as consultative examinations.  *Id.*  To determine how much weight to give an opinion, the ALJ "must apply certain factors – namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (discussing 20 C.F.R. § 1527(d)(2)).

If an ALJ rejects the opinion of a treating physician, she must articulate "good reasons" for doing so.  *Wilson*, 378 F.3d at 544.  "Good reasons" are "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  SSR 96-2p.  An ALJ's failure to follow these procedural requirement "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Rogers*, 486 F.3d at 243. However, there are scenarios involving harmless or de minimis error "where the Commissioner has met the goal of Section 404.1527(d)(2) – the provision of the

18

procedural safeguard of reasons – even though she has not complied with the terms of the regulation." *Wilson*, 378 F.3d at 547; *see, e.g., Nelson v. Comm'r of Soc. Sec*., 195 F.App'x. 462, 472 (6th Cir. 2006) (finding that even though the ALJ failed to meet the letter of the good-reason requirement, the ALJ met the goal by indirectly attacking the consistency of the medical opinions).  The same is true in the instant case.

Here, the ALJ articulated specific reasons for discounting the opinions of Plaintiff's treating physicians, all of which are supported by substantial evidence.  First, with regard to Dr. Ball, the ALJ states:

> In March 2009, a report from [Dr. Ball] reflects claimant is unable to lift heavy items, has trouble climbing, and cannot sit or stand for long periods. This assessment is given some weight in the [RFC] determination, but cannot be given controlling or even great weight as it appears to be based on subjective complaints from the claimant … Dr. Ball's Medical Source Statement from March 2010, which would preclude full-time work at any exertional level, has also been considered, but it is not wholly consistent with objective findings (especially regarding [Plaintiff's] back complaints) … is extremely restrictive and it is given no weight because it is not well supported by the medical records, including Dr. Ball's own notes and [Plaintiff's] treatment history.

(Doc. #4, PageID at 42).

The ALJ's finding is amply supported by the record.  Plaintiff began seeing Dr. Ball as early as September 2004.  (*Id*. at 226).  However, despite Dr. Ball's statement that Plaintiff's pain and impairments had been ongoing for two years, they are not discussed in her medical notes until March 2009.  (*Id.* at 218-27, 252-57, 332-33).  Further, the Physical Capacities Evaluation, which Dr. Ball completed for Plaintiff in March 2010, is unsupported and inconsistent with Dr. Ball's own notes and the administrative record. (*Id.* at 403-04).

Next, the ALJ discredits Dr. Reddivari's opinion, stating:

> The claimant's cardiologist, Dr. Reddivari, provided a non-specific medical source statement indicating that the claimant lacks the stamina to complete a standard workday, but giving no specific work-related restrictions.  One year later, the same source provided another assessment that would preclude any competitive employment at the light or sedentary levels of exertion … set forth in a few broad questions posed on a checkbox form without any narrative explanation or rationale.  Moreover, this would also be contrary to his own follow-up notes indicating that the claimant is doing well from a cardiac standpoint.

(Page ID # 42).

Again, the record supports the ALJ's findings.  Indeed, this Court finds the same deficiencies in Dr. Reddivari's opinions.  Dr. Reddivari completed two medical questionnaires on behalf of Plaintiff in November 2009 and December 2010.  While the ALJ's reference to the "broad questions" in the December 2010 "checkbox form" understates the specificity of its questions, a review of the document shows that the ALJ's assessment of Dr. Reddivari's answers is entirely accurate.  (*See id*., PageID at 445).  The form asks three questions in total.  (*Id.*)  The first two questions are "checkbox" yes/no inquiries regarding Plaintiff's limitations.  (*Id.*)  Dr. Reddivari responds to these questions by checking "no," indicating that Plaintiff is severely limited in his ability to stand, walk, lift, and carry.  (*Id.*)  But, Dr. Reddivari failed to explain his "no" answers and failed to point to medical evidence supporting his answers.  The form next states: "[p]lease describe the objective findings that support your opinion."  (*Id.*)  Dr. Reddivari did not provide any description or response.  (*Id.*)  Next, in the November 2009 medical questionnaire, Dr. Reddivari opines, "[d]on't know" to questions asking for details about Plaintiff's lifting limitations and he did not offer any opinion or explanation

20

related to Plaintiff's ability to walk. (Doc. #4, PageID at 442-43). Dr. Reddivari's opinions on these forms also contradict his own medical notes.

Next, the ALJ gave due weight to Dr. Danopulos's opinions regarding Plaintiff's hand impairments. Plaintiff argues that the ALJ failed to give appropriate weight to Dr. Danopulos's opinion that Plaintiff could not properly use his left hand.[13] (Doc. 5 at 4-5). However, the ALJ cites to both Dr. Danopulos and Plaintiff's hand surgeon, Dr. AlSamkari, in discussing Plaintiff's hand impairments. (*Id*. at 42). The ALJ specifically states that the limitations referenced by Dr. Danopulos are accounted for in the RFC. (*Id.*) Indeed, this is evident by the ALJ's RFC restrictions, such as "no forceful gripping or torque use with the left hand." (*Id*. at 40).

Finally, the ALJ did not err in giving great weight to the state agency review by Dr. Thomas. The ALJ found that Dr. Thomas's opinion should be given considerable weight "because it is well supported and more consistent with the objective medical evidence in the record." (*Id*. at 42). Dr. Thomas supported his opinions with numerous references to medical-test results and examination findings. (*Id*. at 301-02). Further, the ALJ added restrictions to the RFC assessment to "afford some weight to [Plaintiff's] subjective complaints and the combined impact of his impairments, including the effects of obesity." (*Id.*) In addition, Dr. Bolz, having conducted his own review of the record evidence, subsequently affirmed Dr. Thomas's opinion. (*Id*. at 335).

---

[13] With regard to consistency in the medical opinions, it bears noting that the testing and x-rays attached to Dr. Danopulos's opinion are contrary to Plaintiff's allegations of disability, as they reflect that his motor skills range from "good" to "normal." (Doc. #4, PageID at 295-99).

Accordingly, the ALJ did not err in determining the appropriate weight to give each physician's opinions.

### C. The ALJ's Credibility Determination

Plaintiff argues that the ALJ failed to properly evaluate his credibility and articulate the reasons for dismissing his subjective complaints.  Plaintiff alleges that although the ALJ "mentioned some objective medical findings" in support of her credibility determination, she "failed to mention the other objective findings which help [Plaintiff's] claim."  (Doc. #5, PageID at 7).

The Court must "accord the ALJ's determination of credibility great weight and deference particularly since the ALJ has the opportunity … of observing a witness's demeanor while testifying."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  To appropriately evaluate the credibility of an individual's statements regarding subjective symptoms "the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements."  SSR 96-7p.   In making this determination, "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record."  *Id*.  In making a determination of disability, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider his credibility."[14]  *Jones*, 336 F.3d at 476.

The ALJ states:

---

[14] Subjective complaints may "support a claim for disability, if there is also objective medical evidence of an underlying medical condition in the record."  *Jones*, 336 F.3d at 475-76.

> [Plaintiff] alleged that he is no longer able to work due to fatigue and
> dizziness from his heart disease and medication side-effects.  He also
> alleged difficulty using his hands for gripping and manipulation.  His
> allegations of medical problems and impairments are also well summarized
> in his telephone contact with the state agency field office dated February
> 18, 2009.  After careful consideration of the evidence, the undersigned
> finds … the [Plaintiff's] statements concerning the intensity, persistence
> and limiting effects of these symptoms are not credible to the extent they
> are inconsistent with the [RFC] assessment.

(Doc. #4, PageID at 41).

The ALJ proceeds to give specific examples of the inconsistencies between Plaintiff's allegations and the medical evidence.   For instance, the ALJ points to the notes from Plaintiff's cardiologist showing that he was doing "quite well" after his heart catheterization procedures.  (*Id.*)  Further, the ALJ notes that in 2009 Plaintiff had "quit smoking a year ago, [] his lungs were clear … [h]e exhibited full range of motion in all extremities, a normal gait, and negative straight leg raising … he was able to squat, toe and heel walk, and had intact sensation and equal reflexes." (*Id.*)  Further, Plaintiff's argument that the ALJ's assessment is inconsistent with the medical opinions of his treating physicians is misguided.  (Doc. #5, PageID at 453).  As previously addressed, the ALJ appropriately reviewed the opinions of Plaintiff's physicians and ultimately discounted them because she found they were inconsistent with the record evidence. Therefore, the ALJ's assessment is in line with the medical opinions.

Applying great deference to the ALJ's decision regarding credibility, *Jones*, 336 F.3d at 476, and because substantial evidence supports the ALJ's credibility findings, Plaintiff's challenges lack merit.

**D.  Plaintiff's Heart Impairments**

Plaintiff argues that the ALJ erred by failing to recognize that his cardiac catheterization procedures "would have caused him to miss too much work from March, 2008 through January, 2010."  (Doc. #5, PageID at 454).  This argument is without merit.

First, there is no evidence in the record to indicate how much time Plaintiff would have required off from work following the procedures.  In fact, the record reflects that the cardiac catheterization is generally an outpatient procedure.  (Doc. #4, PageID at 260).  Second, the ALJ notes that the Plaintiff's cardiologist found he was doing "quite well" after the procedures.  (*Id.* at 41).

Accordingly, Plaintiff's assertion that he would have missed too much work is speculative and the ALJ did not err in not addressing the issue.

**E.  The ALJ's Reliance on the VE's Testimony and the DOT[15]**

Plaintiff contends that the ALJ erred in relying on the VE's testimony regarding jobs in the regional economy, because the VE based this information on the outdated *Dictionary of Occupational Titles* ("DOT").  (Doc. #5, PageID at 454-55).  Specifically, Plaintiff argues that, based on his RFC, the ALJ found that Plaintiff could only perform unskilled work.  However, the VE's testimony included examples of occupations categorized as unskilled under the DOT but categorized as semi-skilled under the Occupational Information Network ("O*NET").  (*Id.*)  In sum, Plaintiff's argument is

---

[15] Plaintiff also argues here that the ALJ's hypothetical questions were improper because they did not account for the limitations caused by his hand impairments.  However, the Court previously found that the ALJ properly accounted for the full extent of Plaintiff's hand limitations by restricting certain activities in his RFC.  Accordingly, this aspect of Plaintiff's challenges to the ALJ's hypotheticals lacks merit.

that the ALJ failed to resolve conflicts between the DOT and O*NET skill level classifications.

At step five of the sequential evaluation, the ALJ determines whether the claimant's impairments hinder his ability to transition to other work, considering his age, education, work experience, and RFC.  20 C.F.R. §§ 404.1520(g), 416.920(g).  It is the Commissioner's burden to produce evidence indicating there are jobs in the national economy that the claimant could perform based on his RFC.  20 C.F.R. § 404.1512(g). To help determine whether there are applicable jobs in the national economy, the claimant's skills must be evaluated.[16]  20 C.F.R. § 404.1568.  The ALJ may rely on the testimony of a vocational expert to make determinations regarding the transferability of claimant's skills and the availability of jobs.  20 C.F.R. § 416.966(e).  The ALJ will also "take administrative notice of reliable job information available from various governmental and other publications."  20 C.F.R. § 416.966(d).  The DOT, which is published by the U.S. Department of Labor, is specifically listed in the Regulations as a reliable source of vocational information.  (*Id.*)

However, "the ALJ and consulting vocational experts are not bound by the [DOT] in making disability determinations because the Social Security regulations do not obligate them to rely on the [DOT] classifications."  *Wright v. Massanari*, 321 F.3d 611, 616 (6th Cir. 2003) (holding the ALJ did not err in relying on VE's testimony that the unskilled plaintiff could perform a job classified as semi-skilled in the DOT because the

---

[16] The skill level required to perform various jobs is generally categorized as unskilled, semi-skilled, or skilled.  20 C.F.R. § 404.1568.

DOT classifications are not controlling).  The ALJ is required to resolve actual or apparent conflicts regarding skill level classification, which may arise between the VE's testimony and government or agency publications.[17]  *Lindsley*, 560 F.3d at 603; S.S.R. 00-4p, 2000 WL 1898704 (S.S.A. Dec. 4, 2000).  The ALJ accomplishes this by questioning the VE and learning from the VE that such consistency exists.  *Louden v. Comm'r of Soc. Sec.*, 507 F.App'x 497, 499 (6th Cir. 2012).  There is, however, no duty articulated in the Regulations, or by the Sixth Circuit, requiring the ALJ to inquire as to whether the DOT classifications are consistent with other publications.  *See Poe v. Comm'r of Soc. Sec.*, 342 F.App'x 149, 158 (6th Cir. 2009).  And, it is the plaintiff's responsibility to bring concerns regarding conflicting occupational information to the ALJ's attention.  *Ledford v. Astrue*, 311 F.App'x 746, 757 (6th Cir. 2008) ("nothing in applicable Social Security regulations requires the [ALJ] to conduct his or her own investigation into the testimony of a vocational expert to determine its accuracy, especially when the claimant fails to bring any conflict to the attention of the [ALJ]").

Here, the ALJ did not err by relying on the VE's testimony at the hearing.  The ALJ properly questioned the VE and properly relied on the VE's acknowledgement that testimony was consistent with the DOT.  (Doc. #4, Page ID at 74, 77).  The DOT is recognized as a reliable source of vocational information and the ALJ had no further duty to inquire as to whether there were potential conflicts between the DOT and other publications.  *Poe*, 342 F.App'x at 158.  Additionally, Plaintiff failed to object to the use

---

[17] Where conflicts arise regarding skill level classification, the regulatory definitions set forth under § 404.1568 are controlling.  S.S.R. 00-4p, 2000 WL 1898707, *4 (S.S.A. Dec. 4, 2000).

of the DOT or to raise any potential conflicts regarding the skill level classification

during the hearing. Indeed, as in *Hauser v. Comm'r of Soc. Sec.*, 1:12cv00796, 2014 WL

48554 (S.D. Ohio, Jan. 7, 2014)(Litkovitz, M.J.) Report and Recommendations adopted,

2014 WL 221946 (Dlott, C.D.J.), in the instant case, the ALJ gave Plaintiff an

opportunity to cross-examine the VE but Plaintiff did not question the VE's assessments

of the skill level of the jobs about which he testified. (Doc. #4, PageID at 74-79). As a

result, *Hauser*'s reasoning applies in the present case. *Hauser* explains:

> Plaintiff was given the opportunity to cross-examine the VE and did
> not challenge the VE's testimony when she confirmed that the jobs she
> identified were all unskilled. The ALJ was permitted to rely on the VE's
> testimony "given the VE's ability to tailor her finding to an 'individual's
> particular residual functional capacity.'" *Beinlich v. Comm'r of Soc. Sec.*,
> 345 F. App'x 163, 168 (6th Cir. 2009) (quoting *Wright v. Massanari*, 321
> F.3d 611, 616 (6th Cir. 2003) and citing SSR 00–4p (noting that "[t]he
> DOT lists maximum requirements of occupations as generally performed,
> not the range of requirements of a particular job as it is performed in
> specific settings, A VE ... may be able to provide more specific information
> about jobs or occupations than the DOT.")).

*Hauser*, 1:12cv00796, 2014 WL 48554 at *13. And, although *Cunningham* "'suggested

that the particular job descriptions at issue … may have been obsolete, it did not hold that

the DOT is an unreliable or out-of-date source.'" *Id.*, 2014 WL 48554 at *13 (quoting

*Horsley v. Comm'r Soc. Sec.*, No. 1:11cv703, 2013 WL 980315 at *3 (S.D. Ohio, March

13, 2103) (Barrett, D.J.) (quoting *Earls v. Comm'r Soc. Sec.*, 1:09cv1465, 2011 WL

3652435 at *7 (N.D. Ohio, Aug. 19, 2011)).

Accordingly, Plaintiff's challenges to the ALJ's reliance on the VE's testimony

lack merit.

**IT IS THEREFORE RECOMMENDED THAT:**

1.  The Commissioner's non-disability finding be **AFFIRMED**; and

2.  The case be terminated on the docket of this Court.

June 27, 2014

s/ Sharon L. Ovington
Sharon L. Ovington
Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See, United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).